# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.:**

AVERY JAMES KAYTEN, Derivatively on Behalf of MOLYCORP, INC.,

        Plaintiff,

   v.

ROSS R. BHAPPU,
MARK A. SMITH,
CONSTANTINE E. KARAYANNOPOULOS,
JAMES S. ALLEN,
MICHAEL F. DOOLAN,
RUSSELL D. BALL,
BRIAN T. DOLAN,
JOHN GRAELL,
CHARLES R. HENRY,
MARK S. KRISTOFF,
ALEC MACHIELS,
MICHAEL SCHWARZKOPF,
JOHN F. ASHBURN, JR.,
JOHN L. BURBA,
RCF MANAGEMENT, L.L.C.,
PEGASUS CAPITAL ADVISORS, L.P., and
TRAXYS NORTH AMERICA LLC,

        Defendants,
and

MOLYCORP, INC., a Delaware Corporation,

        Nominal Defendant.

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
## FOR BREACH OF FIDUCIARY DUTY, UNJUST
## ENRICHMENT, CORPORATE WASTE AND INSIDER SELLING

---

By and through his undersigned counsel, Plaintiff Avery James Kayten ("Plaintiff") hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") on behalf of Molycorp, Inc. ("Molycorp" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, corporate waste, insider selling, and aiding and abetting thereof.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief derived from the investigation of counsel, which included, without limitation: a) review and analysis of public filings made by Molycorp and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, postings on Molycorp's website concerning the Company's public statements; d) pleadings, papers and any documents filed with and publicly available from the related pending Securities Class Actions (defined herein); and e) review of other publicly available information concerning Molycorp, the Individual Defendants (defined herein) and the Equity Fund Defendants (defined herein).

## NATURE AND SUMMARY OF THE ACTION

1.      This derivative action arises out of the Individual Defendants' scheme to deceive the investing public by issuing materially false and misleading statements concerning Molycorp's financial results and business prospects from July 29, 2010, to the present (the "Relevant Period").

2.      Unlike the other derivative actions pending in this District arising out of similar facts, Plaintiff did not unilaterally step into the shoes of the Company and file a derivative action on the heels of the truth coming out.  Rather, in accordance with Delaware Chancery Court Rule

23.1, Plaintiff made a written demand (the "Demand") that the Board of Directors (the "Board") investigate and take the necessary legal action against those responsible for the damages the Company has suffered. Plaintiff also repeatedly exercised his rights as a shareholder pursuant to Section 220 of the Delaware General Corporation Law to request that he be allowed to inspect the Company's books and records. The Board absolutely refused to take any immediate action. In addition, the Board time after time refused to allow Plaintiff his right to inspect Company records relating to (a) the underlying wrongdoing, or (b) the Board's refusal to take immediate action.

3.     As described in more detail below, certain Individual Defendants, individually and on behalf of the Company, made false and misleading statements in public filings, press releases, and conference calls that touted the likelihood of success for the Company's mining facility in Mountain Pass, California (the "Mountain Pass Mine"), and presented aggressive forward guidance. The remaining Individual Defendants, even if they did not personally make the false statements, breached their fiduciary duties to the Company by not correcting known false statements made on behalf of Molycorp as was necessary to prevent the existing disclosures from being misleading.

4.     The Individual Defendants embarked on this course of conduct in order to create a market for Molycorp shares and inflate the price of those shares to artificially high levels, in order to obtain more than $1.5 billion in proceeds for themselves, to the detriment of Molycorp and its public shareholders.

5.     Molycorp is a producer of rare earth elements ("REEs") and owns and operates one of the largest REE manufacturing facilities in the world outside of China. For years, China has provided over 95% of the world's REEs, which are a necessary component of high-

technology products in many industries, including hybrid vehicle batteries, wind turbine magnets, cellular phones, missile defense systems, and renewable energy products.

6.     During the Relevant Period, the Individual Defendants furthered their scheme to artificially inflate the price of Molycorp stock by causing the Company to promote a strategic plan to expand Molycorp's Mountain Pass Mine.  Throughout the Relevant Period, the Individual Defendants consistently stressed that this expansion would result in a modern, advanced and highly efficient fully-integrated processing facility for REEs, which would result in increased profits for the Company and its shareholders.  In response to questions from analysts who predicted that the price of REEs would fall, Defendant Mark A. Smith ("Smith"), the Company's Chief Executive Officer ("CEO"), told investors that global demand would remain high, and that there would be continued increases in sales volume.

7.     Throughout the Relevant Period, the Individual Defendants consistently maintained that the Company had an effective system of internal and disclosure controls in place concerning its financial reporting, and that the Company's financial performance during the transition would be adequately and accurately reported as a result.  The Individual Defendants signed the Company's Form 10-K SEC filing that included these assurances.

8.     However, unbeknownst to the public, the Company's insiders planned to take advantage of the temporary bubble that inflated the prices of REEs and of Molycorp stock.  The Individual Defendants caused the Company to launch additional public offerings in February 2011 and June 2011, and then used the opportunity to sell their shares for massive profits to the detriment of the Company.

9.     Further, in August 2013, the Company revealed that the Board determined that Molycorp's unaudited financial statements for the three months ended March 31, 2013, should

no longer be relied upon because they contained errors.  By causing Molycorp to restate the Company's financial results, the Individual Defendants have admitted that the financial statements originally issued were false, and that the errors were material.  The improper revenue recognition and resulting restatements were the result of the Individual Defendants' breaches of fiduciary duty.

10.     Due to their positions as officers and directors of the Company, each of the Individual Defendants owed the Company fiduciary duties of care, candor, good faith, and loyalty.  The Individual Defendants breached these duties by, among other things: (1) issuing false and misleading statements, (2) failing to ensure that the Company had adequate financial controls, and (3) maximizing their personal gains to the detriment of Molycorp.

11.     As described in more detail below, each of the Individual Defendants was well aware that the Company's statements were false and misleading, and that the artificially inflated price of Molycorp's stock would eventually drop.  Notwithstanding these facts, instead of informing shareholders of the true financial prospects for the Company, the Individual Defendants continued to deceive investors by reaffirming the Company's earnings guidance and assuring investors that the Company would achieve its business outlook.  As a result of the materially false and misleading statements the Individual Defendants made and disseminated, Molycorp's stock traded at artificially inflated prices during the Relevant Period, reaching a high of $77.54 per share on May 3, 2011.  Molycorp's stock has now declined over 93%, closing at an all-time low of $4.76 on November 7, 2013.

12.     The Individual Defendants' misconduct has subjected Molycorp to multiple class action lawsuits for violations of the federal securities laws (the "Securities Class Actions").  As a

result, Molycorp has expended, and will continue to expend, significant sums of money to defend the Company in the litigation.

13.     Due to the ongoing breaches of fiduciary duty and the Board's refusal to take any action, Plaintiff rightfully brings this derivative action to vindicate Molycorp's rights against its wayward fiduciaries and hold them responsible for the damages they have caused Molycorp. More specifically, Plaintiff brings this derivative action to: (i) recover damages against Molycorp's officers and directors for the benefit of the Company, and (ii) require the Company to reform and improve its corporate governance and internal procedures to protect Molycorp and its shareholders from a repeat of the damaging events described below.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

15.     This Court has jurisdiction over each Defendant because each Defendant is either a corporation that does sufficient business in Colorado, or is an individual who has sufficient minimum contacts with Colorado so as to render the exercise of jurisdiction by the Colorado courts permissible under traditional notions of fair play and substantial justice.  This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

16.     Venue is proper in this Court pursuant to 28 U.S.C § 1391 because one or more of the Defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violation of fiduciary duties owed to Molycorp occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

17.     Plaintiff Avery James Kayten is a shareholder of Molycorp common stock.  He purchased Molycorp common stock on May 9, 2011, and has continuously held his stock ever since.  Plaintiff is a citizen of California.

18.     Nominal Defendant Molycorp is a Delaware corporation with its corporate headquarters located at 5619 Denver Tech Center Parkway, Suite 1000, Greenwood Village, Colorado 80111.  Molycorp is a rare earth element mining company, and the Company's stock trades on the New York Stock Exchange under the ticker symbol "MCP."

19.     Defendant Ross R. Bhappu ("Bhappu") has been the Chairman of the Board since September 2008.  Bhappu is a member and director of RCF Management, L.L.C. ("Resource Capital"), and is also a director of Traxys S.A., the parent company of Traxys North America LLC ("Traxys").  As set forth in detail herein, while in possession of material non-public information concerning Molycorp's financial prospects, Bhappu sold, and caused Resource Capital to sell, significant amounts of Molycorp stock for substantial proceeds.  Bhappu is a citizen of Colorado.

20.     Defendant Smith was a director and CEO of Molycorp from October 2008 through December 2012, and was Molycorp's President from March 2010 to December 2012. As set forth in detail herein, while in possession of material non-public information concerning Molycorp's financial prospects, Smith sold 259,260 shares of Molycorp stock for proceeds of over $13 million.  Smith is a citizen of Colorado.

21.     Defendant Constantine E. Karayannopoulos ("Karayannopoulos") has been the Company's interim President and CEO since December 2012.  Karayannopoulos has also been a director of Molycorp since June 2012.  On October 8, 2013, the Company announced that

Karayannopoulos will step down as President and CEO on December 2, 2013, and will continue to be a director and Vice Chairman of the Board.  Karayannopoulos is a citizen of Canada.

22.     Defendant James S. Allen ("Allen") was Chief Financial Officer of Molycorp, from December 2009 through June 2012, and has been the Company's Senior Vice President of Finance since June 2012, and Treasurer since March 2010.  Allen is a citizen of Colorado.

23.     Defendant Michael F. Doolan ("Doolan") has been Chief Financial Officer and Executive Vice President of Molycorp since June 2012, and has been the Company's Principal Accounting Officer since August 2012.  Doolan is a citizen of Canada.

24.     Defendant  Russell D. Ball ("Ball") has been a director of Molycorp since March 2010.  Ball was also a member of the Audit and Ethics Committee from August 2010 to June 2011.  Ball is a citizen of Colorado.

25.     Defendant Brian T. Dolan ("Dolan") has been a director of Molycorp since September 2008.  Dolan is a member and director of Resource Capital.  As set forth in detail herein, while in possession of material non-public information concerning Molycorp's financial prospects, Dolan caused Resource Capital to sell significant amounts of Molycorp stock for substantial proceeds.  Dolan is a citizen of Colorado.

26.     Defendant John Graell ("Graell") has been a director of Molycorp since March 2012.  Graell is the executive chairman of the Chilean company Molibdenos y Metales S.A. ("Molymet"), and joined the Board after Molymet invested $390 million into Molycorp in exchange for stock.  Graell is a citizen of Chile.

27.     Defendant Charles R. Henry ("Henry") has been a director of Molycorp since August 2009.  Henry was also a member of the Audit and Ethics Committee from August 2010 to June 2011.  As set forth in detail herein, while in possession of material non-public

information concerning Molycorp's financial prospects, Henry sold 69,000 shares of Molycorp stock for proceeds of over $3.5 million.  Henry is a citizen of Florida.

28.    Defendant Mark S. Kristoff ("Kristoff") has been a director of Molycorp since September 2008.  Kristoff is the chief executive officer, president, and director of Traxys S.A., the parent company of Traxys.  As set forth in detail herein, while in possession of material non-public information concerning Molycorp's financial prospects, Kristoff sold and caused Traxys to sell 4,774,448 shares of Molycorp stock for proceeds of over $240 million.  Kristoff is a citizen of Connecticut.

29.    Defendant Alec Machiels ("Machiels") has been a director of Molycorp since September 2008.  Machiels was also a member of the Audit and Ethics Committee from August 2010 to June 2011.  Machiels is a partner at Pegasus Capital Advisors, L.P. ("Pegasus"), and is also a director of Traxys S.A.  As set forth in detail herein, while in possession of material non-public information concerning Molycorp's financial prospects, Machiels caused Pegasus to sell over 12 million shares of Molycorp stock for proceeds of over $618 million.  Machiels is a citizen of New York.

30.    Defendant Michael Schwarzkopf ("Schwarzkopf") has been a director of Molycorp since August 2013.  Schwarzkopf is a citizen of Austria.

31.    Defendant John F. Ashburn, Jr. ("Ashburn") was Molycorp's Executive Vice President and General Counsel from 2008 until March 2013.  As set forth in detail herein, while in possession of material non-public information concerning Molycorp's financial prospects, Ashburn sold 95,184 shares of Molycorp stock for proceeds of over $4.8 million.  Ashburn is a citizen of Colorado.

32.     Defendant John L. Burba ("Burba") was Molycorp's Chief Technology Officer from 2008 until March 2013.  As set forth in detail herein, while in possession of material non-public information concerning Molycorp's financial prospects, Burba sold 118,982 shares of Molycorp stock for proceeds of over $6 million.  Burba is a citizen of Colorado.

33.     Defendant Resource Capital is a private equity fund manager that focuses on investments in the mining industry.  During the Relevant Period, Bhappu and Dolan were partners of Resource Capital and were members of the Resource Capital Investment Committee responsible for decisions regarding Resource Capital's investments, including the sales of Molycorp stock.  As set forth in detail herein, while in possession of material non-public information concerning Molycorp's financial prospects, Resource Capital sold 13,769,319 shares of Molycorp stock for proceeds of over $694 million.  Resource Capital is a Delaware limited liability company with principal executive offices located at 1400 Sixteenth Street, Suite 200, Denver, Colorado.

34.     Defendant Pegasus is a private equity fund manager that focuses on investments in middle-market companies in various industries.  During the Relevant Period, Machiels was a partner of Pegasus.  As set forth in detail herein, while in possession of material non-public information concerning Molycorp's financial prospects, Pegasus sold 12,270,073 shares of Molycorp stock for proceeds of over $618 million.  Pegasus is a Delaware limited partnership with principal executive offices located at 99 River Road, Cos Cob, Connecticut.

35.     Defendant Traxys is a metals marketing and trading company.  During the Relevant Period, Kristoff was the chief executive officer, president, and director of Traxys S.A., the parent company of Traxys.  Resource Capital and Pegasus are both investors in Traxys S.A.  In 2011, the Company made principal payments of $3.1 million to Traxys pursuant to an

inventory financing arrangement.  As set forth in detail herein, while in possession of material non-public information concerning Molycorp's financial prospects, Traxys, through its wholly owned subsidiary TNA Moly Group LLC, sold 2,339,028 shares of Molycorp stock for proceeds of almost $117 million.  Traxys is a Delaware limited liability company with principal executive offices in New York.

36.     Defendants identified in ¶¶19-32 are sometimes collectively referred to herein as the "Individual Defendants."   Defendants identified in ¶¶33-35 are sometimes collectively referred to herein as the "Equity Fund Defendants."   Defendants Bhappu, Smith, Karayannopoulos, Ball, Dolan, Graell, Henry, Kristoff, Machiels, and Schwarzkopf are sometimes collectively referred to herein as the "Director Defendants."  Defendants Bhappu, Smith, Dolan, Henry, Kristoff, Machiels and the Equity Fund Defendants are sometimes collectively referred to herein as the "Insider Selling Defendants."

## SUBSTANTIVE ALLEGATIONS

37.     Molycorp owns and operates one of the largest REE manufacturing facilities in the world outside of China.  REEs are a necessary component of high-technology products in many industries, including rechargeable vehicle batteries, cellular phones, missile defense systems, and renewable energy products.   Mining REEs is difficult, costly, and raises environmental hazards.  In recent years, China has provided over 95% of the world's REEs, and China has maintained a monopoly on the price of REEs.

38.     China has maintained quotas on the amount of REE exports, leading to increased prices as industries continue to demand REEs.  The price of REEs experienced a bubble from 2010 to 2012, as shown in the chart below published in the *New York Times* on October 22, 2013, reflecting the export price of one REE:



39.    The Mountain Pass Mine was discovered in 1949 by uranium prospectors, and was a significant source of REEs through the 1980s.  The mine was closed in 2002, due to increasing maintenance and regulation costs, which resulted in REE production costs that were higher than production costs in China.

40.    The Individual Defendants, recognizing that the inflated price of REEs would allow them to profit from investor interest in companies that could produce these valuable elements, implemented their scheme to use Molycorp for their personal profit.

41.    On April 16, 2010, Molycorp filed a preliminary prospectus with the SEC for an initial public offering ("IPO") of the Company's stock.  Prior to the IPO, the Company priced its shares in the range of $15-$17 per share, with expected proceeds of about $420.7 million.  According to the prospectus, the IPO proceeds would be used to expand and modernize the Mountain Pass Mine, with mining operations expected to restart in late 2010 and ramp up to the production of 19,050 metric tons of REE per year by the end of 2012.  The cost for the modernization project was estimated at $511 million.

42.    On April 21, 2010, a *New York Times* article discussed the Molycorp IPO, and the Company's plans for the Mountain Pass Mine, noting that "Molycorp is making a big bet that its

mine – once the world leader in production of rare earth elements, but now a rusting relic – can be made competitive again."

43.     The article further noted that China's actions regarding REEs "have ignited frenzied investor interest," and that "shares prices of rare earth companies soared eightfold last year… That has encouraged worries about a possible bubble."

44.     On July 29, 2010, Molycorp launched its IPO and raised $393.8 million, selling 28.1 million shares at $14 per share.  The proceeds were less than expected, netting the Company only $360.4 million after the payment of surety bonds.  Following the IPO, investment funds Resource Capital and Pegasus, through entities that they own and/or control including Traxys, collectively owned over 68% of the Company's outstanding stock.  Resource Capital, Pegasus and Traxys each placed representatives on the Board:  Bhappu and Dolan for Resource Capital, Machiels for Pegasus, and Kristoff for Traxys.

## FALSE AND MISLEADING STATEMENTS

45.     An article in *Financial Times* on October 24, 2010 discussed the soaring REE prices, and noted that the REE market resembled other bubbles that had later burst.  The article quoted Karayannopoulos, who would later become Molycorp's interim CEO:

> Constantine Karayannopoulos, chief executive of Neo Material Technologies, a Toronto-listed rare earth processor that has two factories in China, said: "I am concerned that, like all bubbles, when this one bursts, it will end in tears."

46.     Meanwhile, Molycorp's CEO Smith first agreed that there was a price bubble, and then, upon further thought on how such an admission might affect the stock price, retracted it. On October 21, 2010, in an interview on CNBC, Smith stated: "I don't think short-term prices in rare earth (minerals) are prices people ought to be counting on… they are really spiked right now

and *there may be a bubble occurring* because of all of the news and the frenzy." [1]  Smith went on to say: "When you see prices that increase by 600-700% in a 30-day period you have to be very careful and not make future plans based on those kinds of increases."

47.    A week later, on October 28, 2010, in an interview with Bloomberg, Smith retracted his statements.  In response to a reporter's question of whether a bubble was forming, Smith stated: "I made a mistake a few days ago by using the same term.  *I don't believe that there is a bubble, I think that these prices are absolutely sustainable* and that's really based on the very simple facts of supply and demand."

48.    In an article published by *Forbes* on January 11, 2011, Molycorp was referred to as "[o]ne of the greatest private equity deals going," noting that Resource Capital's investment of $110 million was now worth $1.5 billion.  The article reveals that the Company's insiders were very aware of the artificially high stock price:

> Resource Capital still needs to execute the selling part of this equation while keeping Molycorp successful, a detail not lost on Ross Bhappu, the Resource Capital partner who put the investment together and is the chairman of Molycorp.  "We don't want to count our chickens before they hatch," says Bhappu.  "It would be hard not to be excited about it, everybody is really pleased about the performance of Molycorp and that is shared around the office and our (investors) are also equally very happy and we get calls about it from them all the time."
>
> *Resource Capital, which exclusively invests in metals and mining, may move soon to start to realize some of its paper gains.*  The lock-up preventing Molycorp insiders from selling shares expires in February and Bhappu says "if an opportunity arises we would look to monetize some of the position, but we don't want to disrupt the company and the incredible run it has been on."
>
> *"We are weighing our options and evaluating them, I don't know that we have made any clear decisions on it yet," says Bhappu. "If we do sell any shares it would be a relatively small stake."*

---

[1] Unless otherwise stated herein, all emphasis is added.

49.     The events that followed showed the Insider Selling Defendants moving quickly to realize their gains, and the number of shares sold was by no means a "relatively small stake." *In total, over the next few months, the Insider Selling Defendants sold shares for proceeds of more than $1.5 billion*, while continuing to assert that Molycorp needed additional capital in order to become successful.

50.     On January 24, 2011, the Individual Defendants caused Molycorp to file a registration statement with the SEC (the "January Registration Statement"), stating that certain stockholders, including Resource Capital, Pegasus and Traxys, would be selling an undisclosed number of shares in a secondary stock offering to be held in February 2011 (the "February 2011 Offering"). Molycorp would not receive any of the proceeds from the February 2011 Offering.

51.     In the January Registration Statement, the Individual Defendants caused Molycorp to set forth ambitious plans for the Company's "mine to magnets" strategy, based on significant increases in production:

**Modernization and Expansion of Mountain Pass Facility**

*We anticipate a dramatic change in our business and results of operations upon the completion of our planned modernization and expansion of our Mountain Pass facility in connection with our initial modernization and expansion plan and the commencement of metal, alloy, and magnet production in 2012.* For example, we expect to produce and sell a significantly expanded slate of products, including specialty cerium products for water treatment, neodymium and praseodymium metal, neodymium iron boron and samarium cobalt alloys for magnets, europium, gadolinium, and terbium oxides for phosphors, and dysprosium and terbium for magnets.

We acquired the Mountain Pass facility on September 30, 2008 from Chevron Mining Inc., which became the owner of the Mountain Pass facility in 2005 after Unocal Corporation merged with Chevron Corporation. Unocal Corporation had suspended most operations at the Mountain Pass facility by 2002 and, except for pilot processing activities, they remained suspended under Chevron Mining Inc.'s ownership. Additionally, significant reclamation work was completed at the Mountain Pass facility under Chevron Mining Inc.'s ownership.

We plan to utilize the assets we acquired from Chevron Mining Inc. as a foundation to build an integrated rare earth products and technology company, which requires considerable additional capital investment. *We believe the application of improved technologies, along with the capital investment, will allow us to create a sustainable business by cost effectively producing high purity rare earth products. Between now and the start-up of the new processing facility, we anticipate further diversifying our product line* through the production of samarium/europium/gadolinium concentrate from bastnasite concentrate stockpiles. Upon completion of the modernization and expansion of the Mountain Pass facility, we expect to produce lanthanum, cerium, praseodymium, neodymium, samarium, europium, gadolinium, terbium and dysprosium in various chemical compounds and/or metal forms, including alloys. *In addition to the modernization and expansion of the Mountain Pass facility, we expect to significantly broaden our operations* through the addition of a number of downstream activities and products, including rare earth metal production and NdFeB and samarium cobalt alloys. We intend to use some of the NdFeB alloy and dysprosium metal product in a magnet production facility, which we anticipate developing through a joint venture arrangement. *Accordingly, upon full implementation of our "mine-to-magnets" strategy, we expect our new products to have significantly more applications and a broader market base than our current products*.

52.     The January Registration Statement further stated that:

At our Mountain Pass facility, we have the ability to mine, crush, mill and separate rare earth ore to produce individual REEs. We hold a mine plan permit and an associated environmental impact report, which allow continued operations of our Mountain Pass facility through 2042. Since our acquisition of the Mountain Pass facility, we have been producing and selling REOs from stockpiled feedstocks to significantly improve our solvent extraction technologies and capabilities. *We are now achieving greater than 98% recovery in our solvent extraction units at commercial scale for lanthanum, didymium and a heavy rare earth concentrate composed of samarium, europium, gadolinium, dysprosium and terbium, or SEG concentrate, which we believe is one of the highest recovery rates in the world.*

53.     The January Registration Statement also stated that the Mountain Pass Mine

would be able to produce valuable heavy REEs ("HREEs"):

The REE group includes 17 elements, namely the 15 lanthanide elements, which are cerium, lanthanum, neodymium, praseodymium, promethium (which does not occur naturally), samarium, europium, gadolinium, terbium, dysprosium, holmium, erbium, thulium, ytterbium and lutetium, and two elements that have similar chemical properties to the lanthanide elements — yttrium and scandium. The oxides produced from processing REEs are collectively referred to as REOs.

*Light and heavy REEs are contained in all rare earth deposits, including in our deposit at Mountain Pass. Heavy REEs generally command higher prices on a per pound basis than light REEs because heavy REEs are not as prevalent.* Cerium, lanthanum, neodymium, praseodymium and samarium are considered "light REEs" that are more predominant in bastnasite, while europium, gadolinium, terbium, dysprosium, holmium, erbium, thulium, ytterbium and lutetium are considered "heavy REEs" that are more predominant in monazite. *Our reserves are bastnasite, but there are also known monazite occurrences on our property that we are currently examining.*

54.     The February 2011 Offering closed on February 15, 2011.  Individual Defendants Ashburn, Bhappu, Burba, Dolan, Kristoff, Machiels, and Smith each sold significant amounts of shares for proceeds of hundreds of millions of dollars.  Resource Capital, controlled by Bhappu and Dolan, and Pegasus, controlled by Machiels, each sold 29% of its holdings in the February 2011 Offering.  Traxys, controlled by Kristoff, Resource Capital and Pegasus,  sold over 26% of its shares.

55.     Financial reporters observed that the Insider Selling Defendants had sold their shares for extraordinary gains.  As the *Wall Street Journal* reported on February 23, 2011, this was "one of the fastest windfalls in private-equity history: Turning $200 million into a paper profit of about $2.3 billion in just 30 months, or roughly $2.6 million in profit each day."

56.     On March 9, 2011, Molycorp filed its 2010 Form 10-K with the SEC.  Defendants Smith and Allen signed the 2010 Form 10-K.  The 2010 Form 10-K stated:

Our Mine Process and Development Plans

We and SRK Consulting (U.S.), Inc., or SRK Consulting, estimated total proven reserves as of February 6, 2010 of 88.0 million pounds of REO contained in 0.480 million tons of ore, with an average ore grade of 9.38%, and probable reserves of 2.12 billion pounds of REO contained in 13.108 million tons of ore, with an average ore grade of 8.20%, in each case using a cut-off grade of 5.0%, at our Mountain Pass mine.  *Upon the completion of our initial modernization and expansion plan, which we expect to be completed by the end of 2012, we expect to have the ability to produce approximately 19,050 mt of REO per year at our Mountain Pass facility.*  Upon the completion of our recently approved capacity expansion plan, *by the end of 2013, we expect to have the ability to produce*

*approximately 40,000 mt of REO per year at our Mountain Pass facility, or approximately double the amount we will be able to produce upon completion of our initial plan*.  Based on our estimated reserves and an expected annual production rate of approximately 19,050 mt of REO under our initial modernization and expansion plan, our expected mine life is in excess of 30 years.

57.     On May 10, 2011, Molycorp was notified that the United States Department of Energy had placed its application for $280 million in funding on hold, and suggested that Molycorp apply for funding under a different program.

58.     On May 10, 2011, Molycorp filed Form 10-Q with the SEC for the first quarter of fiscal 2011, signed by Smith and Allen.  In a press release issued the same day, the Individual Defendants caused the Company to report positive results and projections as follows:

GREENWOOD VILLAGE, Colo., May 10, 2011 (BUSINESS WIRE) -- Molycorp, Inc. (NYSE: MCP) today announced its financial and operating performance for the first quarter of 2011.

Molycorp generated revenue of $26.3 million in 1Q 2011, an increase of 21% sequentially and 770% year over year. Sequential growth was balanced between increased volumes and higher realized prices. Year-over-year growth was driven by higher volume, substantially higher market prices for rare earth oxides (REOs), and our expanded product suite, which is commanding higher prices than the lanthanum products that comprised essentially all of sales in 1Q 2010.

Net loss in 1Q 2011 narrowed to ($0.9 million) and net loss attributable to common stockholders was ($2.2 million), or ($0.03) per share. Excluding stock-based compensation expense, Molycorp generated adjusted net income of $2.0 million and adjusted net income attributable to common stockholders of $0.8 million, or $0.01 per share.

The Company sold 696 metric tons of REO products in the first quarter of 2011, a 9% sequential increase and 65% year-over-year increase. The Company realized an average sales price of $37.73 per kilogram, compared to an average sales price of $34.02 per kilogram in 4Q 2010, and an average sales price of $7.13 per kilogram for 1Q 2010. Excluding sales under a contract with a price cap currently in effect - which covers one product line and terminates prior to the commencement of run rate production in 2012 at Molycorp's new Mountain Pass processing facility - our average sales price during 1Q 2011 was $65.95 per kilogram. Market prices for REOs continued to increase throughout April.

"We were very pleased to see both sales volume and revenue increase for Molycorp in the first quarter of 2011, as this quarter is typically characterized by slow buying and depressed activity in China due to its New Year celebrations," said Mark Smith, Molycorp President and Chief Executive Officer. "In spite of this, and in spite of the natural catastrophes experienced by Japan in the first quarter, we continued to see strong global demand for our products. Market prices of REOs rose significantly in the first quarter, helping to boost our price realizations."

"A very significant development in the first quarter is the fact that we saw domestic Chinese REO prices rising along with prices for Chinese rare earth exports," Smith said. "This points to several trends that we have noted for some months now: growing demand by China's burgeoning manufacturing sector for Chinese rare earths; continuing success in the Chinese government's efforts to crack down on illegal mining and exports; greater industry consolidation forced by the Chinese government; continuing impact on production of new environmental regulations on Chinese producers; government-mandated production quotas; and a halt to the issuance of new licenses for domestic exploration."

"All of these trends underscore our long-held view that China will continue to restrict rare earth exports to the rest of the world, and is likely on a path to becoming a net rare earth importer in the next several years," Smith said.

"This is also why the two acquisitions we have made so far this year are so important," Smith added. "They provide us with expertise, an experienced workforce, and production capabilities in four of the five production steps needed to deploy the world's first fully integrated mine-to-magnets supply chain outside of China. All that remains is for Molycorp to integrate permanent rare earth magnet manufacturing capabilities into our supply chain, and we are on track to do just that."

59.    On May 24, 2011, the Individual Defendants caused Molycorp to file a preliminary prospectus with the SEC for a secondary offering of the Company's stock.  On June 7, 2011, the Individual Defendants caused Molycorp to file a Form S-1/A Registration Statement (the "June Registration Statement") with the SEC with the final prospectus for the offering.  The June Registration Statement contained the false and misleading statements set forth below.

60.    The June Registration Statement emphasized the production capacity of the Mountain Pass Mine:

- 18 -

We recommended mining operations in December 2010 and are preparing to recommence milling operations, which we expect to occur in the first quarter of 2012. Recommencement of mining and milling operations is coincident with our initial modernization and expansion plan, which will give us the capacity to efficiently produce at a rate of approximately 19,050 mt of REO per year by the end of 2012. Additionally, upon the completion of our capacity expansion plan, we expect to have the ability to produce up to approximately 40,000 mt of REO per year by the end of 2013. In an April 2010 briefing to the U.S. Government Accountability Office, or U.S. GAO, titled "Rare Earth Materials in the Defense Supply Chain," which was prepared in accordance with the National Defense Reauthorization Act for Fiscal Year 2010 (Pub. L.No. 111-84), government and industry officials stated that for a typical exploration-stage mine, once a company has secured the necessary capital to start a mine, it can take from seven to 15 years to bring a property fully online, largely due to the time it takes to comply with multiple state and federal regulations. Since our Mountain Pass facility is not an early stage rare earth project, we believe we have a significant timeline advantage as we have a well-defined ore body, an existing open pit with over 50 years of production history, an existing mine and reclamation plan, proven reserves, substantial permitting, and all necessary technology to successfully process and separate the rare earth elements at a commercial scale.

61.     The June Registration Statement emphasized the potential scope of REE sales, and touted the planned joint venture with Hitachi:

Oxides-To-Metals/Alloys

We expect to sell and transport a portion of the REOs we produce to customers for use in their particular applications. The remainder of the REOs will be processed into rare earth metals. A portion of these metals will be sold to end-users and we expect to process the rest into rare earth alloys. These rare earth alloys can be used in a variety of applications, including but not limited to: electrodes for nickel metal hydride, or NiMH, battery production; samarium cobalt magnet production; and neodymium iron boron, or NdFeB, magnet production. A portion of these rare earth alloys will be manufactured into NdFeB magnets as part of our alloy and magnet production joint ventures, described below, and we expect to sell the rest to end-users.

We currently produce rare earth metals outside of the United States through a third-party tolling arrangement. Additionally, the acquisition of our 90% owned subsidiary, Molycorp Silmet AS (formerly known as Aktsiaselts Silmet), provides us with a European base of operations and doubles our current rare earth production capacity from approximately 3,000 mt per year of REO equivalent to approximately 6,000 mt. Through our acquisitions of Molycorp Silmet AS and Santoku America, Inc. (now known as Molycorp Metals and Alloys, or MMA) in April 2011, we added facilities and equipment for metal conversion and alloy

- 19 -

production within the Molycorp organization. We intend to transport cerium, lanthanum, neodymium, praseodymium, dysprosium, terbium and samarium oxide products from our Mountain Pass facility to our Molycorp Silmet AS and MMA facilities where we will produce rare earth metals and alloys. In December 2010, we entered into a non-binding letter of intent with Hitachi Metals, Ltd., or Hitachi, a leading manufacturer of NdFeB alloys and magnets, to form joint ventures for the production of rare earth alloys and magnets in the United States and to acquire a license for certain technology related to the production of rare earth metals, alloys and magnets. We have completed a joint feasibility study with Hitachi, and we are currently negotiating the joint venture agreements.

62.     The June Registration Statement also suggested that the high prices for REEs

would continue, since demand would exceed supply:

> ***Global consumption of REEs is projected to steadily increase due to continuing growth in existing applications and increased innovation and development of new end uses.*** For example, the integration of rare earth permanent magnet drives into wind power turbines has substantially reduced the need for gearboxes, which increases overall efficiency and reliability. According to IMCOA, global demand for rare earths is expected to increase at a compound annual growth rate, or CAGR, of approximately 6-10% between 2010 and 2015. In addition, according to IMCOA, global demand for rare earths used in magnets is expected to grow at a CAGR of approximately 10-15% over the same period. IMCOA estimates that total global demand for rare earths is expected to increase from 125,000 mt in 2010 to 185,000 mt in 2015, which results in a CAGR of approximately 8% for that period.
>
> China has dominated the global supply of REOs for the last ten years and, according to IMCOA, accounted for approximately 97% of global REO production in 2008. ***Even with our planned production, global supply is expected by analysts to remain tight due to the combined effects of growing demand and actions taken by the Chinese government to restrict exports.*** The Chinese government heightened international supply concerns beginning in August 2009 when China's Interior Ministry first signaled that it would further restrict exports of Chinese rare earth resources. Citing the importance of REE availability to internal industries and the desire to conserve resources, the Chinese government has announced export quotas, increased export tariffs and introduced a "mining quotas policy" that, in addition to imposing export quotas and export tariffs, also imposes production quotas and limits the issuance of new licenses for rare earth exploration. According to IMCOA, China's export quotas have decreased from approximately 65,000 mt of REO in 2005 to approximately 50,000 mt of REO in 2009. In 2008, according to IMCOA, China imposed export taxes of up to 25% on selected REOs (primarily heavy REOs) and up to 15% for all other REOs (primarily light REOs). In addition, according to IMCOA, China's Ministry of Industry and Information Technology issued a plan in 2009 to reduce the production of separated rare earths by 7% to 110,700 mt of REO in 2009. ***China's***

*internal consumption of rare earths is expected to continue to grow, leaving the Rest of World with less supply during a period of projected increasing global demand.* China also dominates the manufacture of rare earth metals, producing substantially all of the world's supply, and the manufacture of NdFeB magnets, producing approximately 80% of the world's supply. Neither capability currently exists in the United States, as confirmed by the April 2010 U.S. GAO briefing.

63.     The June Registration Statement also suggested that Molycorp was on track to produce NdFeB magnets in response to the world's demand:

> NdFeB magnets, which are critical components in "green" technologies and the miniaturization of electronics, are primarily manufactured in China (approximately 80%) and Japan (approximately 20%). Our proposed joint ventures with Hitachi would provide us with additional access to the technology, people and facilities to convert our rare earth materials into rare earth alloys and high-performance permanent rare earth magnets required for production of hybrid and electric vehicles, wind power turbines, high-tech applications and numerous advanced defense systems on which the U.S. economy and national security depend. The consummation of such joint ventures, in conjunction with our current modernization plans, is expected to provide us with the capability to mine, process, separate and alloy individual REEs and manufacture them into NdFeB magnets. *This downstream integration, which we refer to as our "mine-to-magnets" strategy, would make us the only fully integrated producer of NdFeB magnets outside of China, helping to secure a rare earth supply chain for the Rest of World.* In addition to the foregoing, we continue to explore additional joint ventures or other arrangements with third parties for the production of NdFeB alloys and/or magnets.

64.     Investors and financial analysts noted that the sale of additional shares, with the profits going to the Company's insiders, would not benefit Molycorp.  As Jon C. Ogg stated on May 25, 2011, in an article titled "Selling the Bubble: More Insiders Selling Out Molycorp":

> Molycorp, Inc. (NYSE: MCP) is about to see even more shares come to the market.  The company has filed with the SEC to sell up to an additional 11,500,000 shares.  The offering would amount to nearly $700 million more for the market to absorb in stock.  *The proceeds from this sale are not going to help the company ramp up its key production site for rare earth elements.  This is not going to fund more acquisitions.  This is not even going to pay off debt.  All of these shares are being sold by shareholders*.

65.     On June 7, 2011, the Company sold 11.5 million shares in the secondary offering (the "June 2011 Offering").  Company insiders sold over $700 million in stock, including

Resource Capital and Pegasus, which each sold approximately 30% of their remaining holdings. These proceeds did not benefit Molycorp.

66.     Following the June 2011 Offering, the Individual Defendants continued to cause Molycorp to issue statements projecting a successful and productive expansion of the Mountain Pass Mine.

67.     On August 11, 2011, Molycorp filed Form 10-Q with the SEC for the second quarter of fiscal 2011, signed by Smith and Allen.   The Form 10-Q included the following information:

> Prior to securing proceeds for our capital plans through the IPO, the issuance of our Convertible Preferred Stock and our 3.25% Convertible Senior Notes due 2016 or Notes, we submitted a Part I application for a loan guarantee with the U.S. Department of Energy, or DOE, on June 2010 for up to $280 million. On July 21, 2010, the DOE deemed the Company's application eligible for submission of a part II application, which was submitted on December 31, 2010. ***Due to program and resource constraints, our application under Section 1705 of the DOE loan guarantee program, or LGP, was put on hold on May 10, 2011.*** At that time, DOE advised us that our project may be eligible for funding under Section 1703 of the LGP. We have elected to withdraw our application under the DOE loan guarantee program due to our success in raising capital through the Convertible Preferred Stock and the Notes offerings.

68.     In a press release issued the same day, the Individual Defendants caused the Company to report positive results and projections, stating:

> GREENWOOD VILLAGE, Colo., Aug 11, 2011 (BUSINESS WIRE) -- Molycorp, Inc. (NYSE: MCP) (Molycorp or the Company) today announced financial and operating performance for the second quarter of 2011.
>
> Molycorp's $781 million modernization and expansion project at its flagship Mountain Pass, Calif., Rare Earth facility continues on time and on budget, with an annual Phase 1 production rate of 19,050 metric tons of rare earth oxide (REO) equivalent to be achieved by the end of 2012.
>
> The Company generated revenue of $99.6 million in Q2 2011, which compares to revenue of $26.3 million in Q1 2011 and $1.9 million in Q2 2010. Sequential growth resulted from a combination of robust results from its Mountain Pass facility, and the inclusion of revenue from the Company's recently acquired

subsidiaries, Molycorp Metals and Alloys (MMA) of Tolleson, Ariz., and Molycorp Silmet AS (Silmet), located in Sillamae, Estonia.

Mountain Pass revenue grew 130% sequentially to $60.3 million, net of intercompany sales. The growth in Mountain Pass revenue was driven both by higher realized prices and by higher volumes. Market prices for rare earth elements continued to climb during the quarter, as global supplies remain extremely tight. Silmet contributed $29.0 million to revenue net of intercompany sales, while MMA recognized $10.3 million of sales in the period subsequent to the acquisition.

Net income attributable to common stockholders was $43.5 million, or $0.52 per fully diluted share as compared to net losses attributable to common stockholders of $(3.4 million) or $(0.04) per share in Q1 2011 and $(23.3 million) or $(0.47) per share in Q2 2010.

SALES VOLUME UP STRONGLY IN 2Q 2011

Mountain Pass sold 829 metric tons of REO equivalent products, a 19% sequential increase and 212% year-over-year increase. Mountain Pass realized an average sales price of $72.80 per kilogram compared to an average sales price of $37.73 per kilogram in Q1 2011, and an average sales price of $7.16 per kilogram for Q2 2010. Silmet's sales in Q2 2011 included 217 metric tons of REO equivalent products at an average sales price of $69.27 per kilogram and also included 80 metric tons of rare metals (niobium and tantalum) at an average sales price of $167.50 per kilogram. MMA sold alloys containing approximately 53 metric tons REO equivalent products to contribute $10.3 million in revenue.

A majority of the Mountain Pass' lanthanum sales are to one customer under a contract that includes a price cap. That contract was renegotiated effective July 1, 2011 to better reflect the increase in market prices for lanthanum products. Excluding those sales, Mountain Pass' other products realized an average sales price during Q2 2011 of $104.95 per kilogram, as compared to $65.95 per kilogram in Q1 2011.

"We are very pleased with our accomplishments this quarter, as we successfully completed two acquisitions that advance our vertically integrated mine-to-magnets strategy," said Mark Smith, Molycorp President and Chief Executive Officer. "Additionally, we remain on time and on budget with Project Phoenix and we expect to help alleviate the global supply shortage even more when our new plant comes on line next year. Global demand for rare earths remains very high, and supply outside of China continues to be tight, as China continues to reduce its net REO export quotas."

69.    The above statements made by Smith and approved by the remaining Individual Defendants were materially false and misleading because each of these Defendants: (i) knew that the Company continued to lack adequate capital funding and, as such, had no basis to make positive statements about Molycorp's financial health and future growth; (ii) knew the Company could not achieve its reported business outlook and aggressive guidance due to delays in the production capacity at the Mountain Pass Mine; and (iii) knew that high prices for REEs were unsustainable, and that lower prices would adversely affect the Company's financial results.

### THE TRUTH BEGINS TO EMERGE

70.    On September 20, 2011, financial analysts from JP Morgan Chase & Co. cut the target price for Molycorp stock from $105 to $66.  Molycorp's share price plummeted from $53 to $41.45, approximately 22% in a single day, on extraordinarily high-volume trading.  The Company's market capitalization decreased by $969.8 million as a result of these losses.  The stock price continued to steadily decline in the days that followed, closing at a low of $30.12 on October 3, 2011.

71.    On November 10, 2011, Molycorp reported that its financial results for the fiscal 2011 third quarter missed analyst consensus estimates.  At the same time, the Individual Defendants caused the Company to reveal that the Board had authorized an additional investment of $114 million to accelerate the completion of the Mountain Pass Mine expansion, while also disclosing a significant decline in projected production from the mine.  Further, although the Individual Defendants had previously maintained that the Mountain Pass Mine would produce valuable HREEs after the expansion, the Company now disclosed that it could not produce HREEs in commercially viable quantities.  Despite the disappointing results, the Individual Defendants caused the Company to tout its performance in a press release stating the following:

- 24 -

*Project Phoenix Accelerated*

**Company Sets Records for Sales, Margin, and Income**

GREENWOOD VILLAGE, Colo., Nov. 10, 2011 (BUSINESS WIRE) -- Molycorp, Inc. (NYSE: MCP):

## HIGHLIGHTS

- The Company's "Project Phoenix" modernization and expansion project has been accelerated to target Phase 1 production run rate of 19,050 metric tons per year by September 30, 2012, three months earlier than originally planned. Mechanical completion of Phase 2 has been accelerated by six months to year-end 2012.
- Company achieves record sales in Q3 of $138.1 million, a 39% increase over Q2 2011.
- Average sales price (ASP) rose 75% to $131.19 per kilogram of REO equivalent versus $75.14 in Q2 2011.
- Q3 gross margin increased to a record 63%, up from 57% in Q2 2011.
- Record operating income increased 72% to $72.1 million over Q2 2011.
- Q3 EPS of $0.52 per diluted share, or $0.67 adjusted for certain non-cash and other out-of-ordinary items (non-GAAP), per diluted share.

Molycorp, Inc. (NYSE: MCP) ("Molycorp" or the "Company") today announced financial and operating results for the third quarter of 2011, which included record performance in sales, margin, and income.

### *RECORD SALES, MARGIN, AND INCOME*

The Company generated record sales of $138.1 million in Q3 2011, a 39% increase as compared to sales of $99.6 million in Q2 2011 and significantly higher than $8.5 million in Q3 2010. Sequential growth resulted from increased sales volume of lanthanum and didymium as well as a robust pricing environment across all products.

Record operating income in Q3 increased 72% to $72.1 million as compared to Q2 2011, a material increase from the operating loss of $(10.2 million) in Q3 2010.

Net income attributable to common stockholders increased 4% to $45.3 million, from $43.5 million in Q2 2011. Diluted earnings per share for Q3 2011 was $0.52, in-line with Q2 2011 of $0.52. Non- GAAP diluted earnings per share was $0.67, as compared to $0.56 per diluted share in Q2 2011. Non-GAAP earnings

- 25 -

per share adjusts certain non-cash and other non-recurring items as compared to U.S. GAAP earnings per share.

### COMPANY ACCELERATING PROJECT PHOENIX

Molycorp's "Project Phoenix" modernization and expansion plan at its flagship Mountain Pass, California rare earth facility has been accelerated, with the Company now expecting to achieve its Phase 1 production run rate of 19,050 metric tons per year by September 30, 2012, three months earlier than originally planned. The Company's Board of Directors authorized an additional investment of $114 million to fund the acceleration, which includes contingency funds. The acceleration of Project Phoenix Phase 1 will increase the Company's estimated 2012 production by approximately 3,500 metric tons of Rare Earth Oxide equivalent ("REO"), to between 8,000 and 10,000 metric tons.

*The project acceleration will also advance mechanical completion of Project Phoenix Phase 2 by six months, allowing the Company the capability of producing at an annual rate of 40,000 metric tons per year as early as mid-2013, if customer demand warrants.*

*"During the third quarter, we achieved record sales, margin, and income," said Mark Smith, Molycorp President and Chief Executive Officer. "This is a phenomenal accomplishment by our Molycorp family, particularly as we have simultaneously announced accelerated plans for Project Phoenix Phase 1 and 2 at Mountain Pass."*

"In addition, we are pleased to have signed a new three-year agreement with the United Steelworkers, opened a customer service office in Japan, expanded initial sales of XSORBX, and announced our four-pronged strategy for heavy rare earth elements," Smith said. "We continue to see favorable global market trends for rare earths, and our team is working hard to provide an increased, stable supply of rare earth products for these markets."

Other milestones during Q3 and the first several weeks of Q4 included the Company's $20 million investment in Boulder Wind Power and its acquisition of the remaining Molycorp Sillamäe shares for $10 million.

### Q3 SALES

The Company achieved consolidated sales of $138.1 million for Q3 2011. This does not include an additional $37.2 million of intercompany sales, such as feedstock sent from Molycorp Mountain Pass to Molycorp Sillamäe for additional processing into higher-value products, and other intercompany sales. Gross sales at Molycorp Mountain Pass grew 64% to $124.9 million as compared to Q2 2011. The growth in Molycorp Mountain Pass gross sales was driven both by higher realized prices and by higher didymium and lanthanum product sales volumes, and was offset by lower cerium sales volume. Molycorp Sillamäe recorded sales

of $35.9 million during the quarter, while Molycorp Tolleson recognized $14.4 million of sales in the period.

Molycorp Mountain Pass sold 1,002 gross metric tons of REO equivalent products, a slight increase over Q2 2011 and a 92% year-over-year increase. Mountain Pass realized an average sales price of $124.65 per kilogram of REO equivalent. Molycorp Sillamäe's sales in Q3 2011 included 384 gross metric tons of REO equivalent products at an average sales price of $57.08 per kilogram and also included 88 metric tons of rare metals (niobium and tantalum) at an average sales price of $151.50 per kilogram. Molycorp Tolleson sold alloys, including neodymium-iron-boron and samarium-cobalt alloy, containing approximately 52 metric tons REO equivalent products to contribute $14.4 million in sales.

72.     In addition, the Company announced that guidance for the fourth quarter of 2011 was reduced, due to production delays related to the expansion of the Mountain Pass Mine.

73.     The market was not fooled by the optimistic press release issued by the Individual Defendants, and the continued false and misleading projections.  In response to these financial results, the Company's stock price plunged to $33.45 per share on November 11, 2011, a decline of 13.5% from a previous day's closing price of $38.70 per share, on high volume trading.  The decline continued and by the end of the year, the stock price had fallen to close at only $23.98 per share on December 30, 2011, a decline of over 66% from the high on May 9, 2011.

74.     Financial analysts noted the unusual pattern of insider sales of Molycorp stock. On January 17, 2012, Scott Matusow published an article on SeekingAlpha.com titled "Don't Buy Into the Hype."  Matusow noted:

> Most insiders bought at $14 a share… They had huge profits from $14 to $50 a share.  The major red flag here is that only 2 of them bought back any shares. How confident were these guys about their own company if they did not "flip" their shares?  I know if I had confidence in my company's future, I would certainly buy back shares after taking massive profit, wouldn't you?

75.     On June 11, 2012, Molycorp announced the completion of its acquisition of Canadian-based Neo Material Technologies Inc. for $1.2 billion.  In connection with the

acquisition, Karayannopoulos joined the Board, and Doolan became Executive Vice President and Chief Financial Officer of Molycorp.

76.     On November 9, 2012, Molycorp filed Form 10-Q with the SEC for the third quarter of 2012, signed by Smith and Doolan.  The Form 10-Q included the disclosure that the Company was under formal investigation by the SEC.

77.     The same day, the Individual Defendants caused Molycorp to issue the following press release:

**Molycorp Issues Statement Regarding SEC Investigation**

Greenwood Village, Colo. (November 9, 2012) --  In response to inquiries from investors and the news media, Molycorp, Inc. (NYSE: MCP) ("Molycorp" or the "Company") today issued the following statement regarding the Company's disclosure in its third quarter 2012 Form 10-Q with the U.S. Securities and Exchange Commission (SEC):

On August 28, 2012, the staff of the SEC requested information from the Company; subsequently, the Company learned that this request for information was in connection with a formal order of investigation pertaining to, among other things, the accuracy of the Company's public disclosures.  We are cooperating with the SEC staff and are in regular communication with them on this matter.  As a public company, Molycorp maintains disclosure controls and procedures, as well as internal controls, and has extensive processes with respect to the documents it files with the SEC.  As noted in the Company's third quarter 2012 10-Q, the Company cannot predict the length, scope, or results of the matter or the impact, if any, on the Company's results of operations.

78.     On December 11, 2012, the Company announced that Smith would be resigning as the Company's CEO.  As stated in the Company's press release that day:

Greenwood Village, CO (Dec. 11, 2012) - Molycorp, Inc. (NYSE: MCP) ("Molycorp" or the "Company") today announced that its Board of Directors has appointed Constantine Karayannopoulos as Interim President and Chief Executive Officer and is immediately undertaking a search for a permanent President and Chief Executive Officer. He succeeds Mark A. Smith, who has left the Company.

Constantine Karayannopoulos will assume all management responsibilities for Molycorp and its subsidiaries, effective immediately, and will continue to serve as a Director and the Vice Chairman of Molycorp's Board of Directors. A professional engineer, Karayannopoulos previously served as President and Chief

- 28 -

Executive Officer of Neo Material Technologies, a position he held from 2005 until this year. At Neo Materials, Karayannopoulos also served as Executive Vice President and Chief Operating Officer as well as Vice President and General Manager of the company's rare earths business unit and Vice-President of Sales. His exceptional track record in and knowledge of the rare earths industry puts him in a unique position to direct the leading rare earths technology company.

"Molycorp has made significant progress in recent years, culminating in the ramp up of Project Phoenix production capacity at our Mountain Pass facility and the implementation of its vertical integration strategy through the acquisition of Neo Materials, now Molycorp Canada," said Ross R. Bhappu, Chairman of the Board. "With Project Phoenix on track to achieve a Phase 1 run rate by the end of this month, and these significant accomplishments achieved, the Board of Directors believes Molycorp is at a natural inflection point, as it transitions its focus from development to ongoing operations, to bring in a proven business leader with industry experience, a track record of operational excellence and management experience to execute Molycorp's strategy. We are confident we can find a permanent Chief Executive Officer with the expertise and credibility to maximize our great potential."

The Company will remain focused on being the rare earth industry's leading low-cost and high-margin-capture advanced materials company. The Company noted that, in the near term, Mr. Karayannopoulos's focus will include maximizing the synergies between the resource and downstream divisions as well as ensuring that the Company has a sufficient liquidity cushion from cash from operations, tight cost controls, and potential proceeds from revolving credit facilities or certain equipment financing and other sources.

"The Board of Directors thanks Mark Smith for his significant contributions and leadership over the past four years that have brought Molycorp to this natural transition into an ongoing operating business, and we wish him well in his future endeavors," commented Bhappu. "Looking ahead, we have full faith and confidence in Constantine to manage the Company, operating with the best people and assets in the industry."

79.     On June 27, 2013, the Company reported that "the staff of the SEC notified the Company that the Investigation has been completed and that the staff does not intend to recommend any enforcement action by the SEC against the Company." However, the conclusion of the formal SEC investigation does not indicate that there was no misconduct. The provisions of the Code of Federal Regulations regarding SEC enforcement activities, 17 C.F.R. §202.5(d), state:

In instances where the staff has concluded its investigation of a particular matter and has determined that it will not recommend the commencement of an enforcement proceeding against a person, the staff, in its discretion, may advise the party that its formal investigation has been terminated. Such advice if given must in no way be construed as indicating that the party has been exonerated or that no action may ultimately result from the staff's investigation of the particular matter.

## FURTHER RECENT REVELATIONS SUBSTANTIATE PLAINTIFF'S CLAIMS

*Unjustified Termination/Separation Payments*

80.     On March 26, 2013, the Company filed  Form 8-K with the SEC reporting the departure of officers Ashburn and Burba.  Instead of being terminated for cause due to their breaches of fiduciary duty, including their sales of Molycorp stock at inflated prices based on insider information, these Individual Defendants were handsomely rewarded by the other Individual Defendants.  The filing reported that:

On March 22, 2013, Molycorp, Inc. (the "Company") and each of John F. Ashburn, Jr. and John L. Burba, PhD. (together, the "Executives") entered into a Separation Agreement and General Release to set forth the terms and conditions of the Executives' separation from service with the Company (for each, the "Separation Agreement") and a Consulting Agreement to set forth the terms and conditions of the Executives' ongoing transitional consulting services to the Company (for each, the "Consulting Agreement"). As memorialized in the Separation Agreements, Mr. Ashburn's service as the Company's Executive Vice President and General Counsel, and Mr. Burba's service as the Company's Executive Vice President and Chief Technology Officer, separated from service on March 22, 2013, and each Executive resigned from all positions he held as an officer and/or director of the Company's subsidiaries and affiliates, as applicable, effective as of March 22, 2013. In addition, on March 22, 2013, the Company elevated Geoffrey R. Bedford, the Company's then-Executive Vice President of Rare Earths and Magnetics, to the offices of Executive Vice President and Chief Operating Officer.

Separation Agreements

The Separation Agreements provide that each Executive will release the Company and certain other parties from any and all claims, causes of action and demands arising on or prior to March 22, 2013 (the "Release"). As set forth in the Separation Agreements, each Executive has a period of seven days from signing the Separation Agreement within which to revoke the Release, which period will expire on March 29, 2013.

If the Executives do not revoke the Releases within the seven-day revocation period, each will be entitled to the following payments in accordance with their Amended and Restated Executive Employment Agreements with the Company (for each, the "Employment Agreement") and their Performance-Based Restricted Stock Units Agreements (for each, the "RSU Agreement"), each dated February 28, 2012, less withholding for taxes:

- A lump sum cash payment equal to $220,000, payable on the first payroll date following the sixtieth day following the Executive's separation from service date, consisting of one times his target annual bonus opportunity for 2013 as required by the Employment Agreement;

- An amount in cash equal to $400,000, consisting of one year of base salary to which he is entitled pursuant to the Employment Agreement, and payable in substantially equal installments as continued base salary commencing on the Company's first regularly scheduled payroll date following the date on which the Release becomes irrevocable and ending on the first regularly scheduled payroll date following March 22, 2014;

- $7,921 in satisfaction of performance-based restricted stock units under the RSU Agreement, payable on the first regularly scheduled payroll date following the date on which the Release becomes irrevocable; and

- If the Executive elects continuation coverage under the Company's medical plan under COBRA, reimbursement for the Executive's COBRA payments until the earlier of (1) his eligibility for any such coverage under another employer's or any other medical plan or (2) the date that is twelve months following the Executive's separation from service date.

As required under the terms of the Executives' Employment Agreements, they will also receive lump sum cash payments of $83,462.87 for Mr. Ashburn and $65,462.88 for Mr. Burba with respect to their accrued but unused vacation time and all accrued but unpaid base salary through March 22, 2013.

*Improper Financial Reporting*

81. On August 8, 2013, the Company disclosed that it would delay the filing of its quarterly report for the period ending June 30, 2013, and filed Form 8-K with the SEC revealing that:

On August 6, 2013, the Audit and Ethics Committee of the Company's Board of Directors, based upon a recommendation from management, determined that its unaudited Condensed Consolidated Financial Statements for the three months

ended March 31, 2013 should no longer be relied upon because they contained an error with respect to the reconciliation of its physical inventory to the general ledger, which resulted in a cumulative overstatement of costs of sales and understatement of current inventory of approximately $16.0 million. This error also caused the income tax benefit in the first quarter of 2013 to be overstated by approximately $6.5 million, the disclosure of the consolidated assessment of normal production levels to be understated by approximately $17.4 million, and the consolidated total write-down of inventory to be overstated by $18.0 million. The misstatement had no effect on the net cash used in operating activities or cash and cash equivalent at the end of the first quarter of 2013.

In addition, the Audit and Ethics Committee of the Company's Board of Directors also determined that its unaudited Condensed Consolidated Financial Statements for the three months ended March 31, 2013 should no longer be relied upon because they contained an error with respect to the accrual of certain severance charges, which resulted in an understatement of accrued expenses and selling, general and administrative expense of approximately $2.1 million. This error also caused the income tax benefit in the first quarter of 2013 to be understated by approximately $0.8 million. The misstatement had no effect on the net cash used in operating activities or cash and cash equivalent at the end of the first quarter of 2013.

Both errors described above affected the financial position and results of operations of the Resources segment.

82.     On this news, shares of Molycorp stock declined approximately 10%, closing at $6.69 per share.  Also in response to this news, an additional class action was filed against the Company, forcing the Company to continue to expend significant sums of money to defend Company in the litigation.

83.     On August 14, 2013, the Individual Defendants caused the Company to file a restatement on Form 10Q/A with the SEC for the first quarter of 2013.

84.     On October 15, 2013, the Individual Defendants caused the Company to file a restatement on Form 10K/A, certified by Karayannopoulos and Doolan, to amend Molycorp's annual report for the full year 2012.  As the Company disclosed in the Form 10K/A:

We are filing this Amendment No. 2 to our Form 10-K to revise Part II, Item 9A. Controls and Procedures as it relates to our conclusion regarding our disclosure controls and procedures and report on internal control over financial reporting.

As disclosed in our Form 8-K filed with the SEC on August 14, 2013, we filed an amended Quarterly Report on Form 10-Q/A for the quarterly period ended March 31, 2013 and a Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2013. In Part I, Item 4. Controls and Procedures of those Quarterly Reports, we disclosed that, in light of a material weakness that resulted in a restatement of our unaudited condensed consolidated financial statements for the three months ended March 31, 2013, we re-evaluated our conclusion regarding the effectiveness of our internal control over financial reporting as of December 31, 2012. During our assessment of the effectiveness of our internal control over financial reporting as of December 31, 2012, we identified certain deficiencies that were not considered to be a material weakness, either individually or in the aggregate. *Given the subsequent identification of a material weakness for the quarter ended March 31, 2013, we now consider certain control deficiencies identified as of December 31, 2012 to be a material weakness* when considered in the aggregate. *As of December 31, 2012, we did not maintain a sufficient complement of resources with an appropriate level of accounting knowledge, experience and training commensurate with our financial reporting requirements.* This limited our ability, in certain areas, to ensure the necessary consistent communication, reinforcement, and application of accounting policies to make appropriate accounting adjustments and disclosure decisions and resulted in ineffective review of certain reconciliations and journal entries and errors in recording transactions in the financial records.

In addition, and independently from the revision of Part II, Item 9A. Controls and Procedures mentioned above, in this Amendment No. 2 we have updated our capital requirements and liquidity disclosures, revised the December 31, 2012 audited consolidated financial statements and total assets by segments in connection with the final allocation of the consideration transferred to the net assets of Molycorp Canada, and revised the subsidiary guarantor financial information to correct a derivative loss classification error between Parent and Guarantor Subsidiaries in 2012. As a result, we updated our capital requirements and liquidity disclosures in the Management's Discussion and Analysis of Financial Conditions and Results of Operations, and the disclosures contained in Note 3, Note 9, Note 11, Note 15, Note 17, Note 27 and Note 28 to the audited consolidated financial statements contained in Part II, Item 8.

85.    The fact that Molycorp was forced to restate its financial statements is an admission that the financial statements originally issued were false and that the errors were material. Pursuant to Generally Accepted Accounting Principles ("GAAP"), as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Molycorp was to correct for material errors in its previously issued financial statements. *See*

APB No. 20, ¶¶7-13.  Moreover, FASB Statement of Financial Accounting Standard ("SFAS") No. 154, *Accounting Changes and Error Corrections*, states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements."  SFAS No. 154, ¶25.  Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements.  Molycorp's restatements were due to errors with respect to accounting for revenues.  Thus, the restatements are admissions by Molycorp that its previously issued financial results and its public statements regarding those results were false.

86.     The Individual Defendants, Molycorp's directors and officers, were charged with approving, signing and certifying Molycorp's quarterly and annual financial reports that were filed with the SEC and contained the false financial results.  Moreover, the Individual Defendants on the Audit Committee were responsible for reviewing and discussing the financial information included in the Company's earnings announcements, and reviewing the effectiveness and adequacy of the Company's internal controls over financial reporting.  The improper revenue recognition and resulting restatements were the result of the Individual Defendants' breaches of fiduciary duty.

87.     The Individual Defendants' misconduct has damaged the Company and its shareholders.  The Company has incurred, or is likely to incur, millions of dollars in fees and expenses to hire outside attorneys to defend the Securities Class Actions and address the Company's faulty internal controls.  Additionally, the Company's goodwill and reputation have been materially undermined and tarnished.

*Results Fail to Meet Projections*

88.     The Company continues to report disappointing results, which confirm that the inflated forecasts projected by the Individual Defendants at the beginning of the Relevant Period were false and misleading when made.  In spite of this, the Individual Defendants have continued to cause Molycorp to issue unrealistically positive statements regarding the Company's future success.  On August 8, 2013, the Company reported results for the second quarter of 2013, and the accompanying press release included the following statements:

> ***The Company's Mountain Pass facility successfully demonstrated an operating capacity in excess of 15,000 mt per year*** of rare earth oxide (REO) equivalent, making it one of the largest operating rare earth processing facilities in the world.
>
> The Mountain Pass facility's chloralkali plant, which will recycle wastewater and regenerate chemical reagents needed for rare earth separations, remains on track for mechanical completion and commissioning in the second half of 2013.  After the chloralkali plant is optimized, Company officials expect to achieve the facility's cash production cost targets.
>
> "We are seeing increasingly bullish signals from customers across several segments for product demand, and increased demand will coincide nicely with increased production capacity at Mountain Pass and declining production costs," said Constantine Karayannopoulos, President and CEO. ***"As we continue to optimize operations at Mountain Pass, and bring up the chloralkali plant in the second half of 2013, we should be ready to adjust production to meet customer demand and be price competitive with any rare earth producer in the world."***

89.     The above statements were false and misleading when made, because as set forth below, later statements by the Company revealed that the Company has never met the production capacity stated above.

90.     On October 15, 2013, the Company filed Form 8-K with the SEC, which revealed that Molycorp was unable to meet projected production rates at the Mountain Pass Mine, and reported lower than expected sales and cash flow for the first three quarters of 2013.  The SEC filing stated that:

Subsequent to January 2013, a number of developments have occurred that have reduced our cash cushion to a level below what we view as sufficient to ensure we will have no substantial concern about our ability to finance ourselves and led us to seek to raise additional financing:

● In January 2013, we announced that all key production components of the Molycorp Mountain Pass facility were operational and that the facility, which is designed to produce up to 19,050 mt of rare earth oxides, or REO, (including unseparated light rare earth concentrate, or LREC), had begun an orderly ramp-up. *The ramp-up has taken longer than expected, which has led to lower than expected production volumes, revenues and cash flows during the first nine months of 2013*, and delayed our realization of the benefits of our vertical integration strategy while our other operations continued to purchase raw materials from third parties rather than accepting delivery of products from our Molycorp Mountain Pass facility. Production volumes of REO (including LREC) in the first, second and third quarter of 2013 totaled 606 mt, 756 mt and an estimated 1,139 mt at our Molycorp Mountain Pass facility, respectively. While we believe that our Molycorp Mountain Pass facility is capable of producing 19,050 mt of REO (including LREC) per year, to date, *we have demonstrated an annualized production rate of 15,000 mt of REO (including LREC) over brief periods of time, but have not been able to sustain such production rates over prolonged periods of time as we work to optimize our production and operations and remedy mechanical problems that we identify during operations*. We are currently producing at an annualized production rate of approximately 10,600 mt of REO (including LREC), as we continue to work on optimizing production. We are currently targeting to gradually increase our production capacity during 2014 to an annualized production rate of REO (including LREC) of approximately 23,000 mt during the fourth quarter of 2014, although actual production during the first half of the year is expected to be below the design capacity of 19,050 mt on an annualized basis but more than the demonstrated annualized production rate of 15,000 mt of REO (including LREC). Actual production of REO (including LREC) during 2014 will depend on internal requirements for our Chemical and Oxides segment and our Magnetic Materials and Alloys segment and external customer demand as well as our success ramping up and operating our Molycorp Mountain Pass facility. *In addition, our chloralkali plant was not mechanically complete until October 2013 and is still being commissioned, which has delayed our expected realization of lower production costs related to chemical reagents and process wastewater*.

● We estimate that approximately 48.8% of the rare earth material contained in our Molycorp Mountain Pass facility bastnasite ore is cerium, which traditionally has been a lower demand product. While we continue to anticipate that SorbXTM can help stimulate demand for cerium in the longer term, our sales of cerium from our Molycorp Mountain Pass facility have not been meaningful in the last several quarters, and we expect this to continue for a period of time until SorbXTM achieves greater market penetration. We are optimistic that we will

increase our sales of cerium during 2014 as SorbXTM achieves greater market acceptance and we secure other customers for cerium. Our budget reflects an assumption that will be able to sell a substantial portion of our cerium beginning in the first quarter of 2014 once our current SorbXTM testing for various uses is completed and as we qualify our cerium for use in other products. However, we continue to expect that we will be unable to sell a substantial portion of our cerium production during 2014. Accordingly, our margins, EBITDA and cash flow will be negatively impacted until our sales of cerium products manufactured at our Molycorp Mountain Pass facility increase.

● As noted above, production volumes from our Molycorp Mountain Pass facility do not yet reflect anticipated run rates, and we have not yet realized meaningful market penetration for SorbXTM or other cerium-based products from our Molycorp Mountain Pass facility, which has negatively impacted our sales volumes. In addition, the persistent global economic weakness combined with falling prices for rare earth elements, or REEs (which generally results in a very conservative purchasing pattern by our customers), and illegal mining, production and export activity in China unfavorably impacted the volume of products we shipped from our facilities and our realized prices in the first nine months of 2013.

…

Selling prices have also been adversely affected by volatility in the rare earth market. While we have not yet finalized our results, we estimate that average selling prices were also lower during the third quarter of 2013, averaging approximately $16, $39, $38 and $213 per kilogram in each of our segments, respectively. Although the market for REEs remained weak during the first part of 2013, we believe there are recent signs of improving conditions in demand and pricing, although there can be no assurance of improvement. In certain of our segments, particularly Magnetic Materials and Alloys, prices are set at a one quarter lag, so improvements in our results will lag any market improvements. We are forecasting modestly improved prices in 2014 consistent with the outlook of other industry sources. In addition, for the third quarter 2013, we expect write-downs of finished goods and work-in-process inventory due to production costs in excess of net realizable value, slow moving inventory and adjustments to estimated REO quantities; however we are currently unable to quantify these write-downs with any certainty.

…

● We have faced cost pressures in respect of our expected capital expenditures and start-up costs for the modernization and expansion of our Molycorp Mountain Pass facility and certain other capital projects at our Molycorp Mountain Pass facility. Since January 2013, we have experienced additional cost pressures and expanded the scope of certain projects, increasing our cost estimates for the capital expenditures and start-up costs by approximately $100 million. We expect the $100 million increase in capital expenditures and start-up costs to be partially offset by lower than expected maintenance capital expenditures once the

modernization and expansion of our Molycorp Mountain Pass facility is complete. Of the projected capital expenditures for capital projects at our Molycorp Mountain Pass facility, through September 30, 2013, total amount spent on a cash basis is approximately $1.36 to $1.38 billion, excluding capitalized interest. Remaining spending for the capital projects at our Molycorp Mountain Pass facility is expected to be approximately $50 to $70 million in the fourth quarter of 2013 on a cash basis, and we anticipate spending approximately $5 to $8 million on other capital needs in the fourth quarter of 2013. In 2014 and 2015, we anticipate spending an aggregate of $170 to $190 million (including approximately $60 million of maintenance capital expenditures) at our Molycorp Mountain Pass facility primarily consisting of discretionary capital expenditures related to expanding our production capacity up to a run rate of 40,000 mt of REO (including LREC) and recurring maintenance capital and an aggregate of $50 million for other capital needs at our other production facilities in 2014 and 2015.

● While we continue to work on obtaining a revolving credit facility and equipment financings, we do not have any firm commitments for such revolving credit facility, and our success in securing equipment financing has been limited. As a matter of prudent budgeting, we have decided that we should not anticipate revolving credit availability

91.     By cashing out their shares when Molycorp's stock price was high, and causing Molycorp's largest investors to sell large numbers of shares for massive profits, the Individual Defendants breached their fiduciary duties and left Molycorp in its current precarious position, unable to raise funds to meet its capital needs.

92.     Molycorp's stock has now declined over 93% since its closing price of $77.54 on May 3, 2011, closing at an all-time low of $4.76 on November 7, 2013.

## INSIDER SELLING

93.     As part of a deliberate scheme to benefit themselves to the detriment of Molycorp and its public shareholders, once Molycorp's shares were on the market, certain of the Individual Defendants took advantage of the artificially high prices to sell their Molycorp shares for substantial proceeds.  Instead of revealing the facts regarding Molycorp's business prospects and the production capability of the Mountain Pass Mine, the Insider Selling Defendants used their knowledge of material, adverse, non-public information to sell their shares to the detriment of the Company.   The Insider Selling Defendants, individually and through the Equity Fund

Defendants, sold Molycorp common stock during the Relevant Period for profits totaling more than $1.5 billion, as detailed in the following table:

| Name | Date | Shares | Price | Total |
|---|---|---|---|---|
| **Bhappu/Dolan Resource Capital** | 2/16/2011 | 6,976,383 | $ 50.00 | $   348,819,150 |
| | 3/26/2011 | 1,045,053 | $ 50.00 | $     52,252,650 |
| | 6/16/2011 | 5,747,883 | $ 51.00 | $   293,142,033 |
| | | | | **$   694,213,833** |
| | | | | |
| **Machiels Pegasus** | 2/16/2011 | 6,113,616 | $ 50.00 | $   305,680,800 |
| | 3/16/2011 | 929,847 | $ 50.00 | $     46,492,350 |
| | 6/15/2011 | 5,226,610 | $ 51.00 | $   266,557,110 |
| | | | | **$   618,730,260** |
| | | | | |
| **Ashburn** | 2/16/2011 | 26,580 | $ 50.00 | $       1,329,000 |
| | 6/15/2011 | 68,604 | $ 51.00 | $       3,498,804 |
| | | | | **$       4,827,804** |
| | | | | |
| **Burba** | 2/16/2011 | 33,225 | $ 50.00 | $       1,661,250 |
| | 6/15/2011 | 85,757 | $ 51.00 | $       4,373,607 |
| | | | | **$       6,034,857** |
| | | | | |
| **Henry** | 6/15/2011 | 69,000 | $ 51.00 | **$       3,519,000** |
| | | | | |
| **Kristoff Traxys** | 2/16/2011 | 120,782 | $ 50.00 | $       6,039,100 |
| | 2/16/2011 | 2,339,028 | $ 50.00 | $   116,951,400 |
| | 3/16/2011 | 347,450 | $ 50.00 | $     17,372,500 |
| | 6/15/2011 | 1,967,188 | $ 51.00 | $   100,326,588 |
| | | | | **$   240,689,588** |
| | | | | |
| **Smith** | 2/16/2011 | 72,749 | $ 50.00 | $       3,637,450 |
| | 3/16/2011 | 11,596 | $ 50.00 | $         579,800 |
| | 6/15/2011 | 63,956 | $ 51.00 | $       3,261,756 |
| | 6/15/2011 | 110,959 | $ 51.00 | $       5,658,909 |
| | | | | **$     13,137,915** |
| | | | | |
| **TOTAL:** | | | | **$ 1,581,153,257** |

## DUTIES OF THE INDIVIDUAL DEFENDANTS

*Fiduciary Duties*

94.     By reason of their positions as officers, directors, and/or fiduciaries of Molycorp and because of their ability to control the business and corporate affairs of Molycorp, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Molycorp in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Molycorp and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

95.     Each director and officer of the Company owes to Molycorp and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

96.     Resource Capital, Pegasus, and Traxys, as controlling shareholders of the Company, have the same fiduciary duties as the Individual Defendants.

*Audit and Ethics Committee Duties*

97.     The members of the Board's Audit and Ethics Committee (the "Audit Committee"), Defendants Ball, Henry, and Machiels, owed specific duties to Molycorp as provided in the Audit and Ethics Committee Charter.   These duties include: (i) reviewing and

discussing the Company's annual financial statements and disclosures with management and the independent auditor; (ii) reviewing and discussing with management the Company's earnings press releases; (iii) reviewing annually the Company's internal accounting controls, the Company's financial, auditing and accounting organizations and personnel, and the Company's policies and compliance procedures, including a review with the independent auditor of its opinion on the effectiveness of management's assessment of internal controls over financial reporting; (iv) reviewing with management, the independent auditor, and legal counsel, actions taken to ensure compliance with the Company's Code of Business Conduct and Ethics; and (v) discussing with management and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

*Control, Access, and Authority*

98.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Molycorp, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Molycorp.

99.     Because of their advisory, executive, managerial, and directorial positions with Molycorp, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Molycorp.

100.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Molycorp, and was at all times acting within the course and scope of such agency.

*Reasonable and Prudent Supervision*

101.    To discharge their duties, the officers and directors of Molycorp were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Molycorp were required to, among other things:

(a)      refrain from acting upon material inside corporate information to benefit themselves;

(b)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)      remain informed as to how Molycorp conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)      ensure that Molycorp was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF FIDUCIARY DUTY

102.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Molycorp and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of

Molycorp, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Molycorp, the absence of good faith on their part, and a reckless disregard for their duties to Molycorp and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Molycorp.

103.    The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements, or by failing to take any actions to correct the false and/or misleading statements.  The false and misleading statements misled shareholders into believing that Molycorp's modernization plans were operating successfully and would result in increased production for the Company, and would not have an adverse effect on the Company's financial condition, including its revenues, gross margins, or profitability.  As a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Actions which allege violations of the federal securities laws.  As a result, Molycorp has expended, and will continue to expend, significant sums of money to rectify Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

104.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

105.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that Molycorp's organizational and management "transformation" was operating

successfully and would not have an adverse effect on the Company's financial condition, including its revenues, gross margins, or profitability, and that the Company was improving reporting and accountability at a managerial level.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

106.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment and waste of corporate assets; and (b) disguise and misrepresent the Company's future business prospects.

107.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

108.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO MOLYCORP

109.   As a result of the Individual Defendants' wrongful conduct, Molycorp disseminated false and misleading statements.   The improper statements have devastated Molycorp's credibility.   Additionally, Molycorp is now the subject of the Securities Class Actions.   The Company will face substantial costs in connection with an investigation and the lawsuits.

110.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Molycorp's market capitalization has been substantially damaged.

111.   Further, as a direct and proximate result of the Individual Defendants' conduct, Molycorp has expended and will continue to expend significant sums of money.   Such expenditures include, but are not limited to:

(a)          costs incurred in investigating and defending Molycorp and certain officers in class action lawsuits, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

(b)          costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Molycorp's artificially-inflated stock price and inflated revenues; and

(c)          costs incurred from the loss of the Company's customers' confidence in Molycorp's services.

112.   Moreover, these actions have irreparably damaged Molycorp's corporate image and goodwill.   For at least the foreseeable future, Molycorp will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in

illegal behavior and have misled the investing public, such that Molycorp's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND ALLEGATIONS

113.    Plaintiff brings this action derivatively in the right and for the benefit of Molycorp to redress injuries suffered, and to be suffered, by Molycorp as a direct result of the Individual Defendants' breaches of fiduciary duty, unjust enrichment and corporate waste, as well as the aiding and abetting thereof, by the Individual Defendants.  Molycorp is named as a nominal defendant solely in a derivative capacity.

114.    Plaintiff will adequately and fairly represent the interests of Molycorp in enforcing and prosecuting its rights.

115.    Plaintiff acquired shares of Molycorp common stock on May 9, 2011, and has been a shareholder continuously since.

116.    Before filing this derivative action, Plaintiff first demanded that the Board take action, and also repeatedly followed the encouragement of the Delaware Supreme Court to use the "tools at hand" by seeking to inspect the Company's books and records pursuant to his rights as a shareholder.  All of Plaintiff's efforts were refused.

117.    On March 16, 2012, in accordance with Delaware Chancery Court Rule 23.1, Plaintiff made the Demand on the Board to investigate and address the misconduct and, if warranted, to commence litigation against the Individual Defendants.

118.    On March 20, 2012, Plaintiff sent a letter to the Board requesting to inspect books and records for the purpose of investigating possible breaches of fiduciary duties, pursuant to Section 220 of the Delaware General Corporation Law (the "First Section 220 Demand").  On April 5, 2012, the Individual Defendants caused Molycorp to wrongfully deny the First Section

220 Demand, refusing Plaintiff his right to inspection of the requested documents on grounds including that Plaintiff purportedly lacked a proper purpose because he made the Demand.

119.    Several months later, by letter dated August 8, 2012, the Individual Defendants caused the Company to deny the Demand (the "Demand Refusal"). The Company sent Plaintiff the Demand Refusal, claiming that the Board had considered the Demand on August 1, 2012, and "determined, based on the recommendation of the [Audit Committee], that it was not in the best interests of Molycorp to pursue the claims outlined in [the Demand] at this time."

120.    On August 2, 2013, Plaintiff again sought to use the "tools at hand" and exercise his right to inspect the Company's books and records. He sent a letter to the Board seeking to inspect books and records pursuant to Section 220 of the Delaware General Corporation Law (the "Second Section 220 Demand") regarding the Board's consideration of the Demand and the decision to refuse to pursue litigation to address the misconduct. Once more, the Individual Defendants rejected Plaintiff's valid request, and caused Molycorp to deny the Second Section 220 Demand.

121.    Under Delaware law, which applies to Molycorp because it is a Delaware corporation, when a corporation receives a demand letter requesting that suitable action be taken against officers or directors of a corporation, the corporation's board of directors is authorized to establish a special committee of independent directors to determine, after conducting a reasonable inquiry, whether maintenance of a derivative proceeding is in the corporation's best interest. The special committee, or the Board, must provide a reasonable record to show that it has fairly evaluated the facts and legal claims that a derivative plaintiff raises.

122.    The Demand Refusal does not indicate that the Board established a special committee to conduct a reasonable inquiry into whether the Demand was in Molycorp's best

interest.  The Demand Refusal states that the Board decided to defer consideration of any action until there are further developments in the Securities Class Actions, and that the Audit Committee will continue to monitor the Securities Class Actions.  There is no indication that there has been any investigation or reasonable inquiry into the Demand.

123.    Further, the Demand Refusal gives no indication that the Board acted in good faith or on an informed basis in evaluating all relevant facts and legal claims, or that the Board acted independently and with due care in rejecting the Demand.  The Demand Refusal did not provide a copy of any report on the results of any investigation, or indicate whether such a report had been prepared.

124.    Given that the Individual Defendants have refused to provide any books or records to demonstrate that the Board's decision was a valid exercise of business judgment, Plaintiff reasonably believes that the Board's refusal of the Demand was unreasonable and the Individual Defendants failed to conduct a reasonable inquiry and failed to act in good faith, on an informed basis, or in the honest belief that the refusal was in the best interest of the Company.

125.    At the time this action was commenced, the Board of Molycorp consisted of the following nine Defendants: Bhappu, Karayannopoulos, Ball, Dolan, Graell, Henry, Kristoff, Machiels, and Schwarzkopf.

126.    Molycorp has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

127.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.    The Individual Defendants owed and owe Molycorp fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe Molycorp the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

129.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

130.    The Individual Defendants each knowingly, recklessly or negligently: (i) made false or misleading statements that misrepresented or failed to disclose material information concerning the Company, (ii) approved the issuance of such false and/or misleading statements, (iii) failed to take actions to correct such false and/or misleading statements after they had been disseminated by the Company, (iv) failed to act independently and with due care in rejecting the Demand, and/or (v) failed to address the misconduct.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

131.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Molycorp has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

132.    Plaintiff, on behalf of Molycorp, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

133.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Molycorp.

135.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Molycorp.

136.   The Insider Selling Defendants sold Molycorp stock at artificially inflated prices while in possession of material, adverse, non-public information regarding the Company, and were unjustly enriched through their wrongful sales.

137.   Plaintiff, as a shareholder and representative of Molycorp, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

138.   Plaintiff, on behalf of Molycorp, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Corporate Waste

139.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.   The wrongful conduct alleged regarding the issuance of false and misleading statements, was continuous, connected, and was on-going throughout the applicable time period. It resulted in continuous, connected, and on-going harm to the Company.

141.   As a result of the misconduct described above, the Individual Defendants wasted

corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

142.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

143.    Plaintiff, on behalf of Molycorp, has no adequate remedy at law.

### COUNT IV

**Against the Insider Selling Defendants for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information, and Against Defendants Machiels, Kristoff, Bhappu, and Dolan for Aiding and Abetting the Breach of Fiduciary Duty**

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.    At the time the Insider Selling Defendants sold their Molycorp stock, they knew the information described above, and sold Molycorp stock on the basis of such information.

146.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Molycorp stock.

147.    At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's business prospects and the production capability of the Mountain Pass Mine.  The Insider Selling Defendants' sales of stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duty of loyalty and good faith.

148.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits obtained thereby.

149.     Defendants Machiels, Kristoff, Bhappu, and Dolan improperly directed the Equity Fund Defendants to sell their shares of Molycorp stock on the basis of proprietary non-public information concerning the Company's financial condition and future business prospects.

150.     Since the use of the Company's proprietary information for the gain of the Equity Fund Defendants constitutes a breach of Defendants Machiels, Kristoff, Bhappu, and Dolan's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits obtained thereby.

151.     Plaintiff, on behalf of Molycorp, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duty, and unjust enrichment;

B.     Directing Molycorp to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Molycorp and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- provisions to control insider selling;

- a provision to limit the ability of private equity investors to control and influence the Board;

- a proposal to strengthen the Board's supervision of operations, including the Mountain Pass Mine, and to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of Molycorp to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of Molycorp's directors, executives and other employees;

- a proposal to strengthen oversight of the Company's disclosure procedures;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- a provision to appropriately test and then strengthen the internal audit and control functions;

C.      Awarding to Molycorp restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants, including the proceeds of improper insider selling by Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 20, 2013

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
SHAWN E. FIELDS

*/s Frank J. Johnson*

110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
frankj@johnsonandweaver.com
shawnf@johnsonandweaver.com

*Attorneys for Plaintiff*

**VERIFICATION**

I, Avery James Kayten, hereby verify that I am a shareholder of Molycorp, Inc. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Verified Shareholder Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

Date: 11/7/13

Avery James Kayten